BRADLEY B. BUDDY, Appellant, v. UNION TERMINAL RAILWAY COMPANY.

Division Two, December 23, 1918.

1. **ATTRACTIVE NUISANCE:** Extending Doctrine. The doctrine of "attractive nuisance," or of the so-called "turntable cases," has been accepted in this State as well-settled law. But it has gone

Buddy v. Railroad.

far beyond the law and the facts of the old English case of Lynch v. Nurdin, 1 Q. B. 29, upon which it is bottomed, and rests solely, though firmly and beneficently, upon the humane sentiment of putting humanity above property; but it ignores legal landmarks and all other known and settled grounds of legal liability, and so attenuated and fragile is the legal logic by which it is sustained that it should not be extended, in the absence of legislation.

2. ———: ———: **Railway Cars: Dangerous Machine.** Railway cars standing on tracks are not classed as dangerous machines or as "attractive nuisances," and the doctrine of the "turntable" cases is not to be extended to them, the reason being (a) that the danger is obvious, like that from fire or water, and not latent; (b) the great difficulty of putting such cars in motion; (c) the impracticability of locking them, and (d) the futility of blocking them or setting their brakes.

3. ———; ———: **Small Flat Cars.** A railway company was engaged in constructing an extension of its tracks upon its right-of-way at a point about 150 feet distant from a school, at which the plaintiff, nine years and eight months old, was a pupil. On the track the company left standing, for a period of from two to three months, two small eight-wheel flat cars from 16 to 20 feet long, unlocked, unblocked, unbraked and unfastened. The track had a grade of 3½ inches per hundred feet, or nearly nine feet for the 3000 feet of open track, and it took from eight to twelve boys from 9 to 13 years old to move one of the cars. While the cars were not in use, children from the school, among them plaintiff, over the objections of the company, were in the habit of pushing the cars up and down the track, being trespassers, and while six or seven or more of them, whose ages ranged from ten to thirteen years, were engaged in pushing one of the cars, they ran it against plaintiff and caught and pinched his leg between the axle of the car and some piling lying along the track, tearing the calf of the leg and destroying its muscles. *Held*, that the car was not an "attractive nuisance" or such a dangerous machine as would justify a recovery by plaintiff under the doctrine of the "turntable" cases.

Appeal from Buchanan Circuit Court.—*Hon. Thomas B. Allen,* Judge.

AFFIRMED,

*Frank H. Miller* and *Mytton & Parkinson* for appellant.

(1) The court properly permitted the minor upon coming of age to prosecute the case in his own name. 67 Mo. 660. (2) In placing two small, light cars, when not in use, unequipped with brakes, upon its tracks practically at the door of the school house without causing them to be fastened to the rail, or without enclosing them in any manner, when they saw and knew that the small children in attendance upon the school were constantly using them to play upon and about, and when they knew they were dangerous and that injury was likely to ensue, the defendants were guilty of using their property in a manner which was legally wrong and negligent as recognized in the "turn table" or "attractive nuisance" or "attractive appliance" cases. Railroad v. Stout, 17 Wall. 657; Railroad v. McDonald, 152 U. S. 273; Lynch v. Nurdin, 41 R. C. L. 422; Koons v. Iron Mountain Railroad Co., 65 Mo. 592; Nagel v. Mo. Pac. Ry. Co., 75 Mo. 653; Berry v. Railroad, 214 Mo. 593; Kelly v. Benas, 217 Mo. 1; Schmidt v. Kansas City Distilling Co., 90 Mo. 284; Fink v. Missouri Furnace Co., 10 Mo. App. 61; Porter v. Brewing Assn., 24 Mo. App. 1; Kelley v. Parker-Washington Co., 107 Mo. App. 490; Barney v. Hannibal & St. Joseph Railroad, 126 Mo. 372; O'Hara v. Gaslight Co., 131 Mo. App. 428; O'Hara v. Gaslight Co., 244 Mo. 395; Hite v. Bakery Co., 168 Mo. App. 431; Dyer v. Mo. Pac. Ry. Co., 12 Mo. App. 597; Houck v. Railroad, 116 Mo. App. 559; Smith v. Dole Packing Co., 82 Mo. App. 9; Oberholt v. Vietchs, 93 Mo. 422; Moran v. Pullman Palace Car Co., 134 Mo. 641; Jensen v. Kansas City, 181 Mo. App. 359; Witte v. Stifel, 126 Mo. 295; Arnold v. St. Louis, 152 Mo. 173; Hildebrand v. May Merc. Co., 141 Mo. 122; Hall v. Telephone Co., 141 Mo. App. 183; Couer D'Alene Lumber Co. v. Thompson, 215 Fed. 8.

*John E. Dolman* for respondent.

The sole question presented upon this appeal is under the undisputed evidence that a standard railroad flat car standing upon a practically level track in the private yard of the railway company, without any brakes and without being chained to the track, is an attractive nuisance and a "dangerous machine" within the meaning of the "turntable" doctrine. Barney v. H. & St. J. Ry. Co., 126 Mo. 372; Compton v Mo. Pac. Ry. Co., 147 Mo. App. 414; Kaumeier v. City Elect. Ry., 116 Mich. 306, 40 L. R. A. 385; Elliott on Railroads, sec. 1260; Central Branch Ry. Co. v. Henigh, 23 Kan. 347.

FARIS, J.—Plaintiff, then approaching ten years of age, was hurt in 1904, by the alleged negligence of defendant. In 1913 he sued defendant, laying his damages at $30,000. Upon a trial had toward the close of the year 1915, proof was adduced pro and con. At the close of all of the evidence defendant asked, and the court *nisi* gave to the jury a peremptory instruction that under the pleadings and the evidence their verdict should be for the defendant. Thereupon plaintiff took a nonsuit with leave. After an unavailing motion to get this nonsuit set aside he appealed.

Plaintiff in his petition invokes as his sole ground of recovery application of the well-known doctrine of the "turntable cases" to an injury accruing from certain small flat cars left standing unblocked, unlocked and unbraked upon defendant's track then under construction, under such situation, it is averred, as to make such cars an attractive plaything for children. Defendant's answer is a general denial, and a plea that plaintiff was when hurt a trespasser upon defendant's private premises, and that in this situation his injuries were wholly caused by his own contributory negligence.

The facts—and it is already apparent that this case turns wholly upon the facts—run briefly thus: Plaintiff when hurt was nine years and eight months old. He was a pupil in the fourth grade of the Floyd School in St. Joseph. Defendant was then engaged in constructing an extension of its tracks upon its right-of-way at a point about 150 feet distant from this school. In this construction work it used, among others, two small eight-wheeled flat cars, which the evidence on plaintiff's part shows to have been from 16 to 20 feet long, while that of defendant shows that these cars were *at the time standard* flat cars from 28 to 30 feet in length. We must, however, perforce the well-settled rule in a case wherein a demurrer to the evidence has been sustained, look only to the plaintiff's evidence on contradicted points. During the time of the building of this extension these small flat cars stood when not in use upon defendant's track for a period of from two to three months. Children from the Floyd School, among whom was plaintiff, over the objections of defendant, however, were in the habit of pushing these cars up and down the track, on which there was a slight grade of 3½ inches per hundred feet. About the 1st day of June, 1904, while some six or seven or more of plaintiff's fellow-pupils—whose ages ranged from 10 to 13 years—were engaged in pushing one of these cars on this track they ran it against plaintiff and caught and pinched his left leg between the axle of the car and some construction material, namely, piling lying along the track; so that the calf of his leg was torn and the muscles thereof were in part destroyed. Subsequently, and after some three months, the injury wholly healed externally, but left the leg of plaintiff in a slightly undersized and a somewhat weakened condition. Some nine years after this accident and on account of a fresh injury to his toe, blood-poison developed and it became necessary by reason thereof to amputate plaintiff's leg. Answering categorically, the single expert witness who testified as to the proximate cause of the amputation

said that "the former injury had nothing to do with the causation of the blood poisoning; the blood poisoning was caused by a subsequent injury nine years later."

The witnesses for plaintiff—the physician excepted—were schoolmates at the time of the occurrence of the injury to him. Their ages at that time were from 10 to 13 years. Eleven years had elapsed from the date of this injury till they testified in the case. Much divergence of opinion and much deviation from what must have been the actual facts are to expected. All this we find. Plaintiff's witnesses all agree that the cars were not fastened to the track, nor locked, nor blocked, nor braked, or even furnished with brakes. On other vital points they varied greatly. In an effort to fairly present the facts upon the points, (a) how large were these cars, (b) how many pupils it took to move them, and (c) what plaintiff was doing when he was hurt, we excerpt the testimony of all of plaintiff's witnesses on all these points.

The plaintiff testifying for himself said: From the time of my accident, and for two or three months before, they were in the habit of leaving small flat cars on the track by the school. There were two cars. They were small ordinary flat cars about half, about 16 to 20 feet, between 16 and 18 feet. They were lighter, very much lighter, than other freight cars." Upon the point of how many children it required to put the car in motion upon this track, he says "six children could move the car." Touching what he was doing when hurt he says: "When I first saw the car it was probably half a block or a little over below the school, being pushed north by about six or seven children eight or nine or ten years old. I was standing between the ends of the piling when the car got me. I don't remember whether I was pushing or getting ready to push. I started to push the car."

James V. Riley, approximately ten years old when plaintiff was hurt, testifying for plaintiff, said: "The

cars were probably sixteen, or eighteen or twenty feet long. They were undersized flat cars." Upon the point of the force required to move these cars he is not definite, but speaking to the situation in this behalf at the very moment that plaintiff was hurt said: "We were playing with the car at the time he was hurt. Maybe a dozen children had hold of it. We were pushing it north at the time it caught him. He got caught between the boxing and the poles that were lying along the track, between the boxing and the end of the poles. I don't know what he was doing at the time."

Charles F. May, who was eleven years old at the time of the injury to plaintiff, said for plaintiff on the points mentioned, this: "It was a little, small flat car twenty feet long or a little over; it might have been a little shorter. It was light." Upon the question of the force—*kid power*—required to put these cars in motion or as to what plaintiff was doing he does not testify, but says as to the manner of his being hurt that "he was caught between the piling and the boxing on the east side."

Leo Baldin, at the time of the injury to plaintiff twelve years old, testifying for plaintiff, said: "The cars were not ordinary flat cars; they were small *flat cars, consisting of eight wheels,* with no brakes on them, about 18 feet long, of light construction. Five or six or seven children, ten to twelve years old, could push them back and forward there. I was not pushing the car the morning he was hurt. I was on top riding. There were about ten of us around there ranging from nine to twelve years old. I don't know how many were pushing the car. Too young to remember that."

Jesse Whaley, who was twelve years old when plaintiff was injured, testifying for plaintiff, said: "The car might have been twenty feet long and might have been more. I don't believe the car was twenty-eight feet. It might have taken ten or fifteen, or it might have taken a few more to push it. I didn't count

them.  It had taken as many as were there and if there were forty we pushed it, and if there were ten we pushed it."

George Shoemaker, who was eleven years old when plaintiff was hurt, testifying for the latter, said that he was present when plaintiff was hurt, that the cars were from sixteen to twenty feet long and lighter than the ordinary flat car.

Charles Menninger, who was thirteen years old when plaintiff was hurt, said for plaintiff that the cars were between eighteen and twenty feet long and seemed to be light cars. That it "took seven or eight boys to push the car, boys ranging from nine to thirteen years."

The testimony for defendant showed that the cars in question were flat cars from 28 to 30 feet in length, that they were standard cars for use upon steam-operated railroads of the period at which they were built, though smaller than standard flat cars now in use. That they were equipped with brakes, and were used at the time of plaintiff's injury for hauling steel rails, ties, bolts, anchor bars, spikes and dirt in the construction work of extending a line of track which ran near by the Floyd School.  The grade of the track on which plaintiff was hurt was 3½ inches per hundred feet or almost nine feet rise to the three hundred feet of total length of the extension then being constructed.

Upon the facts stated was a case made for the jury?  That is the sole question mooted upon this appeal.  Coming closer to the very marrow of the point at issue, the question is:  Did the testimony bring plaintiff's initial injury within the doctrine of the "attractive nuisance" or "turntable cases?"

Regrettably, the long number of years which were suffered to elapse after the injury and before this action was begun palpably dulled the memories of the witnesses till, as this record makes apparent, much of the testimony is so shot through with contradictions as to be almost impossible of reconciliation.  In short, it is almost impossible to ascertain with any degree of cer-

tainty what the facts are. It is, however, in effect pleaded, as shown by the uncontradicted testimony adduced by the defendant and nowhere denied by plaintiff, that the injury sued for *was caused by a flat car, susceptible of use and actually being used in the operation of a standard-gauge railroad by steam motive power.* This statement is, however, subject to the doubt arising upon this record, whether the piling was not, by reason of its presence too near the track, at least a new cause which broke the continuous sequence of the mere car movement and thereby itself produced the hurt of plaintiff. [Hudson v. Railroad, 101 Mo. l. c. 35.] But be this as may be we leave it out of the case.

The doctrine of the "attractive nuisance," or so-called "turntable cases," has been accepted in this State as the well-settled law. [O'Hara v. Gaslight Co., 244 Mo. l. c. 404; Kelly v. Benas, 217 Mo. 1; Berry v. Railroad, 214 Mo. 593; Nagel v. Railroad, 75 Mo. 653; Koons v. Railroad, 65 Mo. 592.] A number of jurisdictions have refused to accept it, because they have been unable to find that it is bottomed upon sound judicial reasoning. [Wheeling, etc., Railroad v. Harvey, 77 Ohio St. 235; Walker v. Potomac, etc., Railroad Co., 105 Va. 226; Conrad v. Baltimore, etc., Railroad, 64 W. Va. 176; Dobbins v. Railroad, 91 Tex. 60; Ryan v. Towar, 128 Mich. 463; Daniels v. Railroad, 154 Mass. 349.] Nevertheless, so attenuated and fragile is the legal logic by which the doctrine is sustained that the modern tendency is to restrict rather than to extend the field within which the doctrine operates. [Kelly v. Benas, 217 Mo. l. c. 11; Mayfield Water & L. Co. v. Webb's Admr., 129 Ky. 395; Dahl v. Dredging Co., 125 Minn. 90.] All of the authorities agree that the doctrine is bottomed upon the old English case of Lynch v. Nurdin, 1 Q. B. 29. Many of the cases agree—*and if they do not it is manifest*—that the turntable cases go far beyond the strict legal principles involved in the Lynch case supra. Briefly, the facts and the law of that case were that defendant therein negligently left his horse and cart ·

unattended in a public street.  Plaintiff, a child seven
years of age, got on the cart to play.  Another child
led or drove the horse on; plaintiff fell from the cart,
and the cart wheel ran over him and broke his leg.
Held, that defendant was liable, though plaintiff was a
trespasser and his own trespass contributed to his hurt,
and it was therefore ruled to be a question for the jury
whether defendant was negligent and whether his said
negligence caused plaintiff's injury.

In a very able and lucid discussion of the legal
grounds upon which the doctrine of the turntable cases
ought to rest in order to be immune against criticism,
for that they are violative of well-recognized rules of
legal reasoning, the Supreme Court of Texas said there
were of necessity three questions which should be
determined in the affirmative before applying the doc-
trine.  These were: "(1) Did the law impose upon the
company a duty to use care to keep its property in
such condition that persons going thereon without its in-
vitation would be injured? (2) was the child six
years old guilty of contributory negligence? and (3)
was the company guilty of negligence in leaving the
turntable unlocked?" [Dobbins v. Railroad, 91 Tex.
l. c. 63.]

In the case of Lynch v. Nurdin, supra, it is obvious
that defendant owed a duty to the public, including the
plaintiff, not to leave his horse and cart unfastened and
unattended in a public street.  It is of course also
evident that, barring this omission of duty, defendant's
horse and cart had the same right, but no more, to be
in a public street that the plaintiff therein had.  So,
the first query of the Supreme Court of Texas is fairly
answered in the affirmative by the undisputed facts
of Lynch v. Nurdin.  Unfortunately for legal reason-
ing, the same can not be said of the great majority of
the other attractive-nuisance cases.  It is obvious that
in the Lynch case, supra, the infancy and tender years
of the plaintiff go only to, and are in the law of the
case *used only for,* the purpose of excusing his con-

tributory negligence, otherwise present and glaring. The plaintiff was no trespasser upon the street where the cart and the horse were; he was merely a trespasser upon the personal property of the defendant, which personal property was at the time situate at a spot whereat plaintiff and defendant had mutual and equal concurrent rights, but whereat it was a negligent act to leave the horse unfastened and unattended.

But the cases which in the several jurisdictions of the United States ostensibly follow the case of Lynch v. Nurdin, go very much farther than that case, in that they excuse a trespass upon private real property and labor to find some logical basis for the duty to safeguard such a trespasser. In many of the American cases there are involved trespasses both upon real property and upon personal property. Cases wherein, upon any ordinary rule on which legal liability is bottomed, no duty is owed by the landowner to the trespasser, save to forbear inflicting upon him a wanton or malicious injury. Some courts attempt to bottom the duty owed upon the maxim, *Sic utere tuo ut non alienum lædas,* which roughly turned into the vernacular means that one must so use his own property as not to injure others, or strictly, the property of others. But it is difficult to find elsewhere in the law any authority for such an application of this maxim. For the ordinary and usual application of it is to what may for lack of a better term be denominated *extra-territorial injuries.* That is, injuries produced by causes which, *arising from* the property of the tortfeasor, *pass* or flow therefrom *on to the person or property* of him who is injured. But in the application of the "turntable-cases" doctrine the person injured does not get hurt while upon his own property or premises, or by anything passing from, or flowing off the premises of another, but he is hurt while he is off his own proper place or property, trespassing upon the property of his neighbor. [See cases cited in note appended to Cahill v. Stone Co., 19 L. R. A. (N. S.) 1094 et seq.]

It is sometimes said that the legal duty to observe care under this doctrine arises from a species of implied invitation, not involving the actual intention, or even the wish of the defendant that the person injured should come upon defendant's premises, or that he should do the act, or meddle with the instrumentality, which produces his injury, but which invitation consists alone in leaving exposed and unguarded, at a place where defendant knows incompetent persons assemble, a thing which is of such nature as to allure or tempt children of tender years or others *non sui juris* to play with such thing or otherwise use or meddle with it. [Chicago, etc., Railroad v. Fox, 38 Ind. App. 268.] But the difficulties with this rule is that no property-owner can possibly foretell what thing is or may prove to be tempting or alluring to persons *non sui juris*, and the ruled cases show that the doctrine has often been applied to conditions where every effort had been made by the owner of the premises to prevent the meddling use of the alluring object and to keep trespassers off the premises; thus by active inhibition negativing any invitation bottomed upon implication. Moreover, such a reason for the legal duty necessary to uphold this doctrine would inevitably make the doctrine applicable to cases *where fruit, always tempting to children, grows upon high trees, always dangerous to children.* [Ritz v. Wheeling, 43 L. R. A. 148.]

We are therefore forced to the view that the American doctrine of liability for damages caused by "attractive nuisances" so-called has gone much beyond the law and the facts of Lynch v. Nurdin, supra, and that the doctrine is *sui generis*, since there is no well-settled legal foundation upon which to bottom the duty to observe care at all toward a trespasser. This thought was well-expressed by our learned former colleague LAMM, J., who, in the case of Kelly v. Benas, 217 Mo. l. c. 11, after collating and discussing practically all of our Missouri cases upon this subject, said:

"There has been marked judicial eloquence and astuteness in stating the legal ground of liability in the turntable cases and no little difficulty is found in formulating sound and settled legal principles for it to rest on, but it is established in our law, and doubtless on principle ought to be applied (in those jurisdictions asserting the doctrine) to other cases coming strictly within the limits of the doctrine and presenting every ear-marking element upon which liability is predicated in the principal case. While this is so, the manifest distress and injustice flowing from unnecessarily extending the doctrine, or loosely applying it to many conceivable cases, has caused those courts accepting it to restrict its application to the narrowest bounds."

Ought then a doctrine resting, *firmly and beneficently, we concede, but solely,* upon the humane sentiment of putting humanity above property. (Eddington v. Railroad, 57 L. R. A. 561), but otherwise ignoring legal landmarks and all other known and settled grounds of legal liability, be, absent legislation, further extended? We think not.

Discussing this identical question, Judge LAMM, correctly and inimitably said this:

"If the old channel of the law is to be quite changed by the application of the new doctrine automatically and without discrimination, if sentimental considerations (however elevated and tender) are to usurp the place of cold and calm reason as the foundation for rules of law, then the floodgate now damming back liability will be raised, letting in strange and deep waters for the landowner to struggle with. Not only will he be liable for boys drowned while swimming in his stock pond (the idea of swimming being alluring to a boy), for those who fall into uncovered wells, cisterns and cellars (the notion of playing on the brink of such being a boyish one), for children who are suffocated while playing in piles of sand accumulated for building purposes or in sliding down stacks of straw unscientifically piled and exposed, but he may be mulc-

ted in damages for injuries to his neighbors' children, who, romping in his haymow, without his invitation, break their bones by sliding down his hay chute, or those who, playing in his rock quarry, are hurt. Shall he fence against adventurous, trespassing boys? Almost as well suggest 'that he build a wall against birds.' If he is held to liability for injury to the children of Jones because of the way he piles his lumber, by the same token, as to Brown, liability would be fastened on him for the way he piles his stones, his bricks, his corn in pens, his hay ricks and his cord wood on his private grounds—in fact, as has been pointedly said, every landowner will be liable for injuries to his neighbor's children under the new doctrine *except the neighbor himself*. We cannot well write the law that way." [Kelly v. Benas, 217 Mo. l. c. 13-14.]

No case has been called to our attention, nor have we ourselves, after a fairly careful search found any such, wherein this doctrine has been applied to cars whereof the motive power was, as here, steam, or even electricity. In other words such cars, instead of being regarded as attractive nuisances when standing upon railroad tracks, have uniformly been held not to fall into the category of attractive nuisances. [Barney v. Railroad Co., 126 Mo. 373; Compton v. Railroad, 147 Mo. App. l. c. 422; Robinson v. Railroad, 7 Utah, 493; McEachern v. Railroad, 150 Mass. 515; George v. Railroad, 126 Cal. 357; Gay v. Railroad, 159 Mass. 238; Central, etc., Railroad v. Henigh, 23 Kan. 347; Kaumeier v. Elec. Ry. Co., 116 Mich. 306; Louisville, etc., Railroad v. Ray, 124 Tenn. 16; Chicago, etc., Railroad v. McLaughlin, 47 Ill. 265; East St. Louis, etc. Ry. Co. v. Jenks, 54 Ill. App. 91; Myers v. Railroad, 209 Mass. 55; 3 Elliott on Railroads, sec. 1260; 20 R. C. L. 92; 29 Cyc. 465.] This upon the theories, it seems, (a) that the danger is obvious, like that from fire or water, and not latent; (b) the great difficulty of putting such cars in motion; and also, perhaps, (c) the impracticability

276 Mo.—19

of locking them, and (d) the utter futility of blocking them or setting the brakes on them. [See Note to Cahill v. Stone Co., supra.]

Upon the question of whether a railroad car is an "attractive nuisance," or a dangerous machine within the purview of the "turntable-cases" doctrine, this court said in the case of Barney v. Railroad, supra, at page 382, this:

"In the first place, the rule applicable in what is known as the 'turntable-cases' has no application to cases of this sort. Railroad cars and similar machinery are not *dangerous machines* within the meaning of that rule, as is abundantly and exhaustively shown, both directly and indirectly, in the following cases: Bishop v. Railroad, 14 R. I. 314; Catlett v. Railroad, 21 S. W. 1062; Railroad v. McLaughlin, 47 Ill. 265; Gavin v. City, 97 Ill. 66."

In the case of Kaumeier v. Railroad, 116 Mich. l. c. 312 et seq., the Supreme Court of Michigan, said:

"The car in question in the present case was not dangerous in its construction. It was a plain car, with four wheels, with no machinery about it. It had no brake, but was a small platform car. It is true that it stood upon a track where it might be moved by several children applying their united strength. Several children might, in the same way, move a wagon or carriage left beside the highway. We apprehend that no claim of negligence could be sustained against the owner of such a vehicle if one of the children climbing upon it should fall off and be run over, even if the wheels were left without blocking. . . . The defendant had just as much right to leave this car where it did as a farmer would have to leave his wagon or carriage upon his own side of the highway, and no one would have the right to move it, except upon the claim that it impeded public travel. The car being rightfully left where it was upon the track, and not being a thing

dangerous in itself, the court should have directed the verdict in favor of the defendant.''

In the case of Cahill v. Stone Co., 153 Cal. 571, 19 L. R. A. (N. S.) 1094, the plaintiff, injured by having his foot crushed by a push-car loaded with rails and left unattended, unlocked, unbraked and unfastened upon a railroad track, was allowed to recover—if in the view of the jury his alleged lack of tender years or understanding should not preclude him.   The latter case comes nearer upon its facts to the instant case than any other we have been able to find in the books. Granting, at least for the argument's sake, the correctness of the ruling in the Cahill case, it may be, we thing, fairly distinguished from the case at bar.   There the car causing the plaintiff's hurt was not a standard steam railway flat car of the period, but a push-car, inferably, though the reported case does not in terms so say, of the ordinary size and well-known sort. Neither does the report of the Cahill case disclose how much force, or how many  ''kid-power,'' was required to put this push-car in motion.   In the case of the flat car here in question, the testimony shows that it required from six to eight boys from nine to thirteen years of age to move the car, and then it would only run a short distance and stop.   Some of plaintiff's witnesses say that it required ten or fifteen children to put the flat car in motion.   One of them said ''may be a dozen children had hold of it'' at the time the plaintiff was hurt.   Such being the case, nothing is plainer than that any sort or size of car could be moved *if only enough children should devote themselves to the task,* and that thus any sort of car, however great in size or weight, or any other movable construction or mechanism, could be converted into a dangerous machine, and thus brought within the doctrine of the turntable cases, if there is to be no limit set to the numbers, or the force required to overcome inertia and initiate motion.

We are for these reasons constrained to take the view that the learned trial judge was correct in his ruling and that the judgment rendered below ought to be affirmed.

Let it be so ordered.    All concur.