BETTY RUTH HULL, a Minor, by C. O. HULL, her next friend, v. M. E. GILLIOZ, doing business as M. E. GILLIOZ CONSTRUCTION COMPANY, Appellant.—130 S. W. (2d) 623.

Division One, July 7, 1939.

1228

*Mann, Mann & Miller* and *Finch & Finch* for appellant.

*Frank B. Williams, William R. Collinson* and *Emil B. Corzine* for respondent.

HYDE, C.—This is an action by a minor plaintiff (her guardian has been substituted for next friend), for damages for personal injuries. Plaintiff had judgment for $12,500, and defendant has appealed.

Plaintiff was injured by the fall of a heavy iron beam when she was playing with other children on defendant's premises. Plaintiff's case is based on the attractive nuisance doctrine. The sole question on this appeal is the sufficiency of the evidence to make such a case. Therefore, the facts hereinafter stated are those shown by the evidence most favorable to plaintiff. Defendant was a contractor en-

gaged in construction work. He owned a lot eighty feet wide and 140 feet deep, on the north side of Main Street or Front Street, in the southwest part of the City of Monett. This street was the closest street to the railroad tracks and yards. There were no houses on the south side of the railroad. This lot was used by defendant as a storage place for heavy material used on construction jobs. This material consisted of "heavy beams and piling and heavy timbers." Among these were some steel I-beams about forty-three feet long, twenty-four inches high, with a nine and one-fourth inch flange at the top and bottom, weighing about seventy-two and one-half pounds per lineal foot. The upright part, or web, was "a little better than half an inch thick." These were used "for the false work to support the concrete" in building bridges and viaducts. After such use defendant would "release those beams and take them out," when such concrete work was properly set, and "then return them to the material yard." In this yard they were kept upright (standing on one flange) instead of lying on the edges of both flanges, because "one reason (is) they won't warp that way, and the other is we paint the beams when they come in so they won't weather." They would collect rain and snow and "naturally rust" if not kept in that position. These I-beams were stored in two layers. The bottom layer was on heavy timbers (10x10, 12x12, and 14x14), while the top layer was on 4x4 and 12x4 timbers placed on the bottom layer of I-beams. "Part of these beams had been there between six and seven years, and some six or seven months prior to that accident; some had been in and out." These beams were moved in and out with trucks and rollers, and also at times a crane was used. They were placed on the west side of the lot with the south ends of the beams about 7 feet north of the sidewalk. This part of the lot was somewhat higher than the sidewalk. The material yard was not fenced and defendant's evidence was that a fence would have interfered with the moving in and out of the heavy materials stored there. On the south end of the stack of round piling on the east side of the lot, there was nailed a sign, partially broken off, which contained the words "Keep Off." Part of the letters were gone, but the words could still be made out. There had been another sign up near the north end of the lot but was gone at the time of plaintiff's injury. No watchman was kept at the lot. Defendant's main office was seven or eight blocks from this material yard. He employed seven men in his office and had "quite a few men working (for him) outside of the office who live in Monett." Neither defendant nor his employees "had occasion to be upon this lot at any time except when they were there to get material."

At the time plaintiff was injured, a number of these I-beams had been taken out of the center part of the upper tier and cross pieces on which they had rested were also removed. This exposed the top of the first tier so that they formed a comparatively level platform

about ten feet wide and forty feet long between the I-beams remaining in the upper layer. The beams, remaining in the upper tier, were thus left in two widely separated groups. There were four beams at the east end of the upper layer and there were others at the west end. The beam that fell on plaintiff was the westernmost beam of the east group. It rested on the ends of three wooden cross pieces which were beneath the easternmost beams of that group. Two of the cross pieces were near the ends of the beam (about two and one-half feet from the south end) and one was near the center. The north cross piece supporting this I-beam, according to plaintiff's measurements, projected eight and one-half inches from the edge of the flange of I-beam east of it, the middle one projected only six and one-half inches and the south one eight and one-half inches. Before the west one fell, there was a space estimated to be from an inch and a half to three inches between the I-beams from flange to flange. The projecting part of the center cross piece, observed immediately after the accident, showed the imprint, of the beam that fell exactly four inches wide measured from the end of the wood. The projecting south cross piece was decayed (it was "rotten pulp wood") to a considerable extent back from the end of it. The center cross piece was somewhat thicker than the other two, and "seemed to be a solider piece of timber." According to these measurements, the nine and one-fourth inch base or flange of the I-beam in question rested on about six inches of wood at the north and south ends, and on about four inches of wood in the center. The I-beam was not otherwise supported or braced.

There were houses on each side of defendant's material lot. There were other houses across the street and on streets to the north. Plaintiff's family lived in the house adjoining it on the east, having moved in with another family the week before she was injured. There were two small children in each of these families, the oldest of the four children being ten years old. Plaintiff was then eight years old. These children all played on defendant's lot. There were also three small children, in the house on the west side of defendant's lot, who played there. According to plaintiff's evidence, this lot had been used as a playground and children had played on these I-beams for six or seven years before plaintiff was injured. "They (children) would play hide-and-go-seek around them, get up on them and play show . . . they left a grandstand seat for some of them we would call it, and others would play down below and have a regular show for children. . . . Fifteen or twenty children playing at a time over there, at practically all hours of the day. : . . They would play show, carnival and play hide-and-go-seek around the logs. They would hide around them and hunt each other. . . . Twenty-five or thirty children, maybe more than that, there at times. . . . They came from all parts of town, from over on the hill, the north part, different parts; they come up from high school and down that way.

. . . They played running games and such as that, and they had shows and things like that on there, carnivals. They would be there all times of day.".

Plaintiff's evidence further showed that for a year or more prior to plaintiff's injury the west beam of the east group would move and rock. None of the other beams would rock. Plaintiff's witnesses said that the children would sit or stand on this beam and get it in motion first by pushing against it and later by the swaying of their bodies. It would move far enough to strike the beam next to it on the east. When it did so, it would make a loud noise. "It rang when the children would play on it and rock it back and forth, and sometimes rock far enough to hit against another one and it would make a sound you could hear a block. . . . There would be about twenty-five or thirty kids on there and they would all rock that iron and it would make big pops when it rocked. . . . The children would rock it back and forth. . . . This beam kept doing this way and kept working over a little more and a little more as the children played on it. . . . They could rock it and make woop, woop, woop, that kind of a noise. . . . They played show and played school and rocked that beam and beat on it with rocks, and would make all the noise they could. They would run anywhere from the age of three years old up to sixteen. . . . The beam that projected over these pieces was the one that fell on Betty. It had projected over like that for something like a year. Children had been playing on it all the time. That was why it rocked so easily, it projected over this 3x10 (by measurement it was 4x12), and this gave it a chance to rock, and every time they rocked it, it worked off this 3x10. . . . They used to play carnival over there and rock it for swings . . . would have that (beam) for a swing."

Plaintiff also had evidence that defendant's truck driver, who originally brought the beams to the lot and who had later aided in moving some of them, was told of this condition. Mr. Hood, a carpenter who lived in this neighborhood, said that he told defendant's truck driver, who was his neighbor, several months before plaintiff's injury, "not to leave it that way, somebody would get killed." The driver denied this. Defendant said he had not "been to that material yard more than four times" since the I-beams were put there. It was shown that defendant was told about an injury sustained by a nine-year-old boy on the piling stored on this lot. There was evidence that several people who had noticed the condition of the beam had warned children playing there that it was dangerous. However, plaintiff had never been warned and started playing there because she saw others there.

On the day plaintiff was injured only the four small children from the house on the east of defendant's lot where plaintiff lived were playing there. The children living in the house on the west had gone in to dinner. It was shown that, by that time, as few as three children

could sit on the beam and rock it so that it would strike the beam east of it. One of the girls with plaintiff said that "it made a groaning sound" when they ran on it, and "it would teeter." Plaintiff said they were "playing tag and chasing each other . . . that one (beam) started to fall and we all started to jump and I got my foot hung under one of them. . . . Q. What were you doing just before it started to fall? A. Rocking it." Plaintiff's leg was crushed so that it had to be amputated above the knee and her hands were also badly injured.

The attractive nuisance doctrine was apparently first applied in this country to railway turntables. [Sioux City & P. Railroad Co. v. Stout, 17 Wall. 657, 21 L. Ed. 745; Koons v. St. L. & I. M. Ry. Co., 65 Mo. 592; Nagel v. Mo. Pac. Ry. Co., 75 Mo. 653.] It is frequently called the turntable doctrine. [See U. of Mo. Bulletin, 26 Law Series 32.] It is appellant's position that this court has never applied the doctrine to anything but a turntable (and should not do so) except in one case, later repudiated. [Schmidt v. Kansas City Distilling Co., 90 Mo. 284, 1 S. W. 865.] The doctrine is said to have been based upon principles stated in the English case of Lynch v. Nurdin (1841), 1 Q. B. 29, 113 Eng. Rep. 1041. [See Buddy v. Union Term. Railroad Co., 276 Mo. 276, 207 S. W. 821; 36 A. L. R. 46 note.] Lynch v. Nurdin was not a case involving trespass upon land but only of meddling with a horse and wagon left unattended in a public street. However, the doctrine has since been applied to turntables in England. [Cooke v. M. G. W. Railway Co. (1909), A. C. 229, 15 Ann. Cas. 567.] In some of our states, the doctrine has been extended very far, while others have refused to follow it at all. [See notes 36 A. L. R. 34; 39 A. L. R. 486; 45 A. L. R. 982; 53 A. L. R. 1344; 60 A. L. R. 1444.] The Missouri cases are collated and discussed in the above-cited note in U. of Mo. Bulletin, 26 Law Series 32. The American Law Institute's Restatement of Torts, section 339, states the doctrine as follows:

"A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if

"(a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and

"(b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and

"(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and

"(d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

It is clear, as shown by the Missouri Annotations to the Restate-

ment, that this court has been unwilling to extend the doctrine as far as the rules adopted by the Restatement would extend it. We have refused to apply it to ponds (Overholt v. Vieths, 93 Mo. 422, 6 S. W. 74; Moran v. Pullman Car Co., 134 Mo. 641, 36 S. W. 659; Rallo v. Heman Const. Co., 291 Mo. 221, 236 S. W. 632.) ; or to lumber piles (Kelly v. Benas, 217 Mo. 1, 116 S. W. 557) ; or to iron pipes (O'Hara v. Laclede Gaslight Co., 244 Mo. 395, 148 S. W. 884) ; or to a building under construction (Witte v. Stifel, 126 Mo. 295, 28 S. W. 891) ; or to standing railroad cars (Buddy v. Union Term. Railway, 276 Mo. 276, 207 S. W. 821) ; or to climbing a pole so as to come in contact with electric wires (State ex rel. K. C. L. & P. Co. v. Trimble, 315 Mo. 32, 285 S. W. 455.) Perhaps all these cases could be reconciled with the rules of the Restatement on the ground that the utility of these things to the owner was of such importance as to preclude the imposition of a duty upon him to change the situation. Certainly this would seem to be true of the pond cases. To require an owner to either fence, fill or drain a pond would not only put him to considerable expense, but would also destroy part or all of its utility to his property. However, the principles stated in our decisions do otherwise conflict with the rules of the Restatement in the following respects: First, they limit the doctrine to situations where children's trespasses are due to the attractions of a dangerous instrumentality or condition, instead of applying it to conditions and instrumentalities that children could not see or know about without first becoming trespassers; and, second, they limit the doctrine to instrumentalities and conditions which are inherently dangerous instead of applying it to conditions in which danger has been created by mere casual negligence under particular circumstances. In O'Hara v. Laclede Gas Light, supra, this court stated that the doctrine was applicable to "inherently dangerous and inherently attractive objects." Thus it seems that this court has taken a middle ground which does not place undue burdens and restrictions upon a landowner, but which does recognize that the creation of inherently dangerous situations, which tends to attract children on to his land, will place upon him some duty to take care to protect them.

The United States Supreme Court has taken a similar position as to the first proposition. [United Zinc & Chemical Co. v. Van Britt, 258 U. S. 268, 42 Sup. Ct. 299, 66 L. Ed. 615.] There, in the clear and expressive language of Justice HOLMES, it is said: "While it is very plain that temptation is not invitation, it may be held that knowingly to establish and expose, unfenced, to children of an age when they follow a bait as mechanically as a fish, something that is certain to attract them, has the legal effect of invitation to them although not to an adult." This seems to be as sound a basis for the doctrine as can be stated. It seems reasonable to say that an artificial condition, created by a landowner on his land, becomes an

attractive nuisance only when it is both inherently dangerous and so located as to attract children to it. On this basis, it seems just to hold that a landowner, who maintains an attractive nuisance, has imposed on him a duty to take reasonable precautions to protect children, who are not able to appreciate its inherent danger, and are attracted to it. Most duties, imposed by the law of torts, arise out of circumstances and are based on "foreseeability" or reasonable anticipation that harm or injury is a likely result of acts or omissions. [See Lowery v. Kansas City, 337 Mo. 47, 85 S. W. (2d) 104.]

This basis would also eliminate the grounds for fears, expressed by many courts, that the doctrine would be applied to wheelbarrows and lawnmowers, or to upturned rakes, scythes and other tools left where someone might step on them (Ryan v. Towar, 128 Mich. 463, 87 N. W. 644); or to meddling with farm implements left in a field or to climbing windmills (Turess v. N. Y. S. & W. Railway Co., 61 N. J. L. 314, 40 Atl. 614); or to climbing fruit trees (Buddy v. U. T. Ry. Co., 276 Mo. 276, 207 S. W. 821); or to sliding down hay stacks or hay chutes (Kelly v. Benas, 217 Mo. 1, 116 S. W. 558); or that, as said by Judge Lamm in the latter case, "every landowner will be liable for injuries to his neighbor's children, . . . except the neighbor himself." Inherently dangerous means that danger inheres in the instrumentality or condition itself, at all times, so as to require special precautions to be taken with regard to it to prevent injury; instead of danger arising from mere casual or collateral negligence of others with respect to it under particular circumstances. [Burbee v. McFarland, 114 Conn. 56, 158 Atl. 538; Southern Cotton Oil Co. v. Anderson, 80 Fla. 441, 86 So. 629, 16 A. L. R. 255; Majestic Theatre Co. v. Lutz, 210 Ky. 92, 275 S. W. 16; O'Hara v. Laclede Gas Light Co., 244 Mo. 395, 148 S. W. 884; Scales v. Lewellyn (N. C.), 90 S. E. 521; U. of Mo. Bulletin, 26 Law Series 27.] While the poisoned pond, in United Zinc & Chemical Co. v. Van Britt, supra, was certainly in an inherently dangerous condition, it was not an attractive nuisance because it was not in a place where it could even be seen except by one who had first trespassed far upon the premises. Furthermore, it was not shown that it had ever attracted anyone before and the children who went into it did not live in that community. A turntable is obviously both inherently dangerous and likely to attract children if located as shown in Koons v. St. L. & I. M. Ry., supra; Nagel v. Mo. Pac. Ry. Co., supra; and Berry v. St., M. & S. E. Railway Co., 214 Mo. 593, 114 S. W. 27. But it can hardly be true, as appellant argues here, that only a turntable (or similar machinery) could be an attractive nuisance. [Fink v. Missouri Furnace Co., 10 Mo. App. 61; Dwyer v. Mo. Pac. Ry. Co., 12 Mo. App. 597; Leeright v. Aherns, 60 Mo. App. 118; Anderson v. C., G., W. Railway Co. (Mo. App.), 71 S. W. (2d) 508.]

What is the result of the application of these principles to

the case at bar? Appellant's brief frankly admits the existence of the elements of exclusive control, location in a populous portion of the city, and habitual use by children as a playground. Certainly it appears that plaintiff was not warned of or aware of the risk involved. Certainly also the attractiveness of the pile of beams and the easy access to them was sufficiently shown. Large heavy objects that they can move and cause to make a noise are sure to be attractive to children. These beams were almost close enough to the sidewalk for one to reach out and touch them. The noise they made could be heard all over the neighborhood. Appellant argues that this case lacks the element of inherent danger of the turntable cases and says that the pile of beams in this case cannot be distinguished from the pile of lumber in Kelly v. Benas, supra. In the Kelly case the lumberyard was partly fenced and a watchman kept on the premises. Plaintiff's son, in the Kelly case, had also been frequently warned to stay out of the yard. Our conclusion, however, is that there is a very substantial difference between ordinary sticks of lumber, however piled, and iron beams of more than 3000 pounds weight; and that it is as much an inherently dangerous condition for beams of such weight to be so placed that children may put them in motion as it would be to leave a turntable so that they could move it. Here the condition existed long enough to reasonably warrant the inference that defendant knew or should have known of it, and there is affirmative proof that his employee, who assisted in creating the condition, was specifically notified about the existing danger. We, therefore, hold that plaintiff made a jury case under the attractive nuisance doctrine as restricted by the decisions of this court.

The judgment is affirmed. *Bradley, C.,* concurs.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concurs.

### ON MOTION FOR REHEARING.

HYDE, C.—Appellant (and *amicus curiae*) says that the opinion herein is inconsistent because it states that the attractive nuisance doctrine is applicable only to "inherently dangerous and inherently attractive objects," but applies it to an iron beam which is not an inherently dangerous instrumentality. However, we ruled that an object might be "inherently dangerous" either because of danger inhering in the instrumentality itself, or inhering in the condition in which it was left, at all times during the existence of the instrumentality or the condition which caused the injury. In other words, to make the doctrine applicable, where the condition, in which the instrumentality is left, is the cause of injury, it must be a condition which is so dangerous at all times that, without the concurrence of any

casual or collateral negligence of third persons to increase the danger at or near the time of the injury, it should reasonably be anticipated as likely to cause injury to children playing there unless special precautions are taken to prevent it. Certainly that is just what is true of a turntable. It is only inherently dangerous if left in a certain condition: Namely, unlocked so that it can be moved by children. If locked so that they could not move it, then it could not be held to be an inherently dangerous instrumentality. It would not explode if children touched it, nor would it poison them, nor would it give them and electric shock, nor turn over on them and crush them as this I-beam did. Therefore, it is the inherently dangerous condition of a turntable that is the basis of the turntable doctrine of liability.

We have not here made "casual or collateral negligence of others with respect to (this beam) under particular circumstances" the basis of liability herein. On the contrary, we held that it was the inherently dangerous condition (existing for months at least) of a very heavy beam, making it so unstable that it would move and rock even when very small children got on it. We see no distinction between a ponderous object of this kind which children can move, so that moving will cause it to turn over and crush them, and a turntable which they can move so that moving will cause it to turn against them and crush them. Appellant says the distinction we suggest between ordinary sticks of lumber (and other things they mention) and this heavy iron beam is a distinction without a difference. This is, of course, not the only distinguishing feature between this case and Kelly v. Benas, supra. However, concerning a similar contention, the United States Supreme Court once said: "Things do not have to be in broad contrast to have different practical and legal consequences. Actions take estimation from degrees, and of this life and law are replete with examples." [Industrial Accident Commission v. Davis, 259 U. S. 182, 42 Sup. Ct. 489, 66 L. Ed. 888.]

The motion for rehearing is overruled.

PER CURIAM:—The foregoing opinion by Hyde, C., is adopted as the opinion of the court. All the judges concur, except *Hays, P. J.,* absent.