STATE OF MISSOURI at the relation of W. E. CALLAHAN CONSTRUCTION COMPANY, Relator, v. WILLIAM C. HUGHES ET AL., Judges of the St. Louis Court of Appeals.—159 S. W. (2d) 251.

Division One, October 30, 1941.

Rehearing Denied, December 12, 1942.

Motion to Transfer to Banc Overruled, February 26, 1942.

*John F. Evans* for relator.

*Clark M. Clifford* and *Lashly, Lashly, Miller & Clifford* for respondents.

BRADLEY, C.—Certiorari to quash the record and opinion of the St. Louis Court of Appeals in Street et ux. v. W. E. Callahan Construction Co. (Mo. App.), 147 S. W. (2d) 153. We are concerned only with whether or not the opinion is in conflict with the last controlling decision of this court on the point ruled, and for the facts we look solely to the opinion of the Court of Appeals. State ex rel. St. Louis-San Francisco Ry. Co. v. Shain et al., 345 Mo. 574, 134 S. W. (2d) 89, and cases there cited.

Donald Street, 9 years old, and son of Charles Street and wife, was killed while playing with other boys, around cooper's buckets at the stone quarry of the relator in southwest St. Louis. The father and mother obtained a judgment against relator for $6000 and that judgment was affirmed by the court of appeals, and the present cause in certiorari followed.

The cause in the court of appeals proceeded on the theory that the cooper's buckets at the quarry constituted an attractive nuisance likely to cause injury to children playing about them and that relator, in the exercise of ordinary care, should have so anticipated.

The court of appeals stated the facts as follows:

"Donald was killed while playing around one of these cooper's buckets. He was nine years old at the time. The bucket was about three and a half to four feet tall and about four feet in diameter. The handle when upright was higher than the bucket, about five feet above the bucket. The handle was rectangular in shape. The ends of the handle were fastened at about the middle of the bucket. The handle was about one inch thick and four inches wide. The bucket and the handle were made of iron or steel. There was a ring on the handle the purpose of which was to hold the handle upright by being fastened over an upright piece of steel at the top of the bucket. The buckets were all alike in size and structure. There were seven of these buckets in the quarry at the time of the accident. The handles of two of the buckets were in an upright position. The others were lowered to the ground. One of the handles in an upright position was held in position with the ring fastened over the upright metal piece. The handle of the bucket about which Donald was playing when he was killed was in an upright position, but the ring was not fastened over the upright metal piece so as to prevent it from falling. The result was that it fell and struck Donald across the back of the neck and killed him instantly. The handle was so heavy that it required the full strength of four or five boys to lift it off of Donald's neck.

"The quarry was located in the southwest part of the city of St. Louis, about a half block from Winona Street. There were numerous dwelling houses near the quarry, the closest houses being only about seventy-five feet from the quarry.

"Prior to the accident which caused Donald's death, defendant had been operating the quarry for three or four months. During that time children had habitually and almost daily resorted to the quarry and played around the cooper's buckets, with the knowledge of defendant's employees working in the quarry. The children were never warned to keep away from the quarry except when the workmen were blasting. When the blasting was finished the boys would return to the buckets and renew their play, without any objection or warning on the part of defendant's employees. The quarry was not fenced,

or otherwise enclosed, and there were no signs posted to warn children to keep away from the quarry or the buckets.

"On the day of the accident a group of boys, six in all, residing in the neighborhood of the quarry, arranged to go to Webster Groves to play in a sandpile somewhere in that neighborhood, while another person going with them was getting an old truck. On their way to Webster, as they were passing by defendant's quarry, they saw the quarry and the buckets in the quarry, and decided to go into the quarry and play about the buckets. They had all played about the buckets many times before, with the knowledge and under the immediate observation of defendant's employees, and without any objection or warning from the employees to keep away from the quarry or the buckets. The boys usually went to the quarry to play about the buckets on Saturdays and after school on other days. They played hie spy, or hide and go seek, and tag, for which it appears the buckets as located in the quarry were well adapted.

"One of the boys testified: 'Before Donald was killed the boys would go over to the quarry every evening after school during the week and on Saturdays and play hide and go seek and tag and jump in and out of the buckets and play around on them. On the day Donald was killed there was six of us boys and we started out with some fellow that was going to get an old truck, and we walked down, and we went through my yard. We were standing on Lindenwood, and we went through my yard, that is a block south, and we went down the alley and through a lot which brought us out on Winona, then we went down Winona to the edge of the drainage sewer, and we looked over it, and just about a half block away this quarry was, and it had all these buckets and things in there, and we stopped.' We made up our minds we would stop there and play for a while. These buckets we had fun on them before and so we stopped there and played with these buckets.'

"On the occasion of the accident in question here, the boys went into the quarry at about one o'clock in the afternoon and proceeded with their play about the buckets. They climbed on the buckets, jumped in and out of them and around them. The bucket around which Donald was playing, as already said, did not have the ring locking the handle onto the metal piece at the top of the bucket. He got into the bucket and when he jumped out onto the ground the handle fell and struck him across the back of his neck, throwing him to the ground, where he lay with the handle across his neck until it was lifted off by the other boys. One of the boys testified: 'Well, there were four or five of us got hold of the handle and lifted on it and we had an awful time lifting it, and we could not have lifted it, I don't believe, it was so heavy, unless we were scared and that gave us an extra strength.' There were engaged in playing around the buckets, besides Donald, his brother Charles, eleven years old, Arthur Hilton,

eleven years old, two McCarthy boys about eight and nine years old, and one McCarthy boy about sixteen years old.

"The cooper's buckets when in use were swung on a crane to which the handles were attached. They were generally in use when the quarry was in operation, but were not all in use at the same time. The quarry was not in operation when the accident occurred."

In the brief relator says: "The effect of respondents' opinion is to extend the doctrine to the point where it would become a jury question in every case as to whether or not a particular instrumentality was inherently dangerous and attractive to children. This is in conflict with a general principle of law, enunciated in controlling decisions, that the attractive nuisance doctrine will not be extended beyond the principle of the turntable cases," citing Howard v. St. Joseph Transmission Co., 316 Mo. 317, 289 S. W. 597; Buddy v. Union Terminal Ry. Co., 276 Mo. 276, 207 S. W. 821; State ex rel. Kansas City Light & Power Co. v. Trimble et al., 315 Mo. 32, 285 S. W. 455; Kelly et al. v. Benas et al., 217 Mo. 1, 116 S. W. 557.

And relator further says: "In holding that an iron container constituted an attractive nuisance, the opinion is in direct conflict with several controlling decisions on similar facts," citing Kelly v. Benas, supra; Rallo et al. v. Heman Construction Co. et al., 291 Mo. 221, 236 S. W. 632; O'Hara v. Laclede Gas Light Co., 244 Mo. 395, 148 S. W. 884; Witte et al. v. Stifel et al., 126 Mo. 295, 28 S. W. 891; Buddy v. Union Terminal Ry. Co., supra; Emery et ux. v. Thompson, 347 Mo. 494, 148 S. W. (2d) 479. Relator also cites and relies upon Hull v. Gillioz, 344 Mo. 1227, 130 S. W. (2d) 623.

It will not be necessary to review all these cases. In Hull v. Gillioz, supra, the attractive nuisance doctrine was considered somewhat at length, and it could serve no useful purpose to repeat or extend that discussion here. The salient facts in the Hull case are stated in headnote 3 (344 Mo. 1228) as follows:

"Where steel I-beams, 43 feet long, 24 inches high, with a 9¼ inch flange, weighing 72½ pounds per lineal foot, were lying on the flange side in two layers within reach of the sidewalk and one such layer rested on wood in such way that it would move and rock when the children played on it, and where there was evidence that defendant's truck driver had notice of the condition, and it fell, breaking the leg of a child eight years of age, a submissible case was made under the attractive nuisance doctrine."

The American Law Institute's Restatement of the Law of Torts, Sec. 339, gives the attractive nuisance doctrine as follows:

"A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if (a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and (b) the

condition is one of which the possessor knows or should know and which he realizes or should realize as involving an ▮▮▮ unreasonable risk of death or serious bodily harm to such children, and (c) the children, because of their youth, do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein.''

▮ It is pointed out in the Hull case (130 S. W. (2d) l. c. 627) ''that this court has been unwilling to extend the doctrine as far as the rules adopted by the Restatement would extend it;'' that the decisions of this court (1) ''limit the doctrine to situations where children's trespasses are due to the attractions of a dangerous instrumentality or condition, instead of applying it to conditions and instrumentalities that children could not see or know about without first becoming trespassers,'' and (2) that the decisions of this court ''limit the doctrine to instrumentalities and conditions which are inherently dangerous instead of applying it to conditions in which danger has *been created by mere casual negligence* under particular circumstances'' (italics ours).

▮ It will be conceded, we think, that the cooper's buckets were not *inherently dangerous* when the handles were down. It appears, supra, that relator had been operating the quarry for three or four months, and that ''during that time children had habitually and almost daily resorted to the quarry and played around the cooper's buckets'' with the knowledge of relator's employees working in the quarry. Relator says that the opinion of the court of appeals does not find ''that relator left the bucket with the handle upright and the ring unattached, and it is entirely conceivable that the ring was removed by the casual act of a trespasser or by the children themselves.'' We will assume, without deciding, that the court of appeals found that relator *left* the handle up with the ring unattached. Even though such be assumed, it will be conceded, we think, that there was no evidence, so far as appears in the opinion, when, if ever before, or over what period relator had *left* this bucket handle standing with the ring unattached. Absent such evidence, the single act of leaving the offending handle standing, with the ring unattached, was no more than ''mere casual negligence,'' and not evidence sufficient to establish that defendant *maintained* an attractive nuisance. There cannot be a nuisance, attractive or otherwise, except from a condition maintained over an unreasonable period of time.

▮ We are constrained to rule that the opinion of the court of appeals is in conflict with the law of the attractive nuisance doctrine as laid down in Hull v. Gillioz, supra, our latest decision on that subject. So holding, it follows that the record and opinion of the court

1216

of appeals should be quashed, and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.