Morris A. Williams et al., Appellants, v. Kansas City, Clay County & St. Joseph Railway Company, Respondent.[*]

Kansas City Court of Appeals. April 30, 1928.

---

[*]Corpus Juris-Cyc References: Evidence, 23CJ, section 1970, p. 150, n. 32; Negligence, 45CJ, section 183, p. 779 n. 45 46; Railroads, 33Cyc, p. 777, n. 10.

W. K. Amick and C. W. Meyer for appellant.

Chas. H. Mayer, Floyd M. Sprague and Roscoe P. Conkling for respondent.

ARNOLD, J.—This is an action in damages for the death of plaintiffs' minor son, alleged to have been due to the negligence of defendant.

The facts of record are that plaintiffs are husband and wife residing near St. Joseph, Buchanan county, Missouri. Defendant is a railroad corporation, organized and existing under the laws of Missouri and, as such, owns a railroad right of way and tracks between the cities of Kansas City and St. Joseph in said State, up-

on which it operates cars and trains for the transportation of freight and passengers.

The petition alleges that plaintiffs were the parents of William Francis Williams, six years of age at the time of his death on June 22, 1926, on which date said child was drowned in a water hole located on defendant's right of way west of its tracks, close to and opposite a culvert which passed under said tracks about 300 feet south of Enright station and near the south corporate limits of the city of St. Joseph. The negligence charge is that defendant negligently caused a water hole to be on its right of way and maintained thereat "a nuisance attractive to children," and negligently and in violation of law, failed to fence its right of way with a lawful fence. The petition seeks damages in the sum of $10,000, but at the close of plaintiffs' evidence, and by leave of court, the petition was so amended as to ask damages in the sum of $7500.

The answer is a general denial. There was a directed verdict for defendant and plaintiffs have appealed.

The evidence shows that the boy came to his death by drowning in a creek which passed under defendant's right of way and tracks at the point heretofore indicated. The evidence further shows that the said creek was a natural watercourse of rather moderate dimensions and that defendant had constructed a concrete culvert about ten feet in width and from seven to nine feet high, with a flat bottom or floor, arched at the top, at the point where the said creek passed under its tracks. The culvert ran approximately east and west under the tracks and at each end there was an abutment to keep the dirt from sliding. At the west end of said culvert there was a spillway. Beyond the spillway and adjoining it at the west end thereof, there was a concrete apron over which the water ran, forming a waterfall from three to five feet high to the level of the creek below the apron. Ordinarily the creek was only about three inches deep at the culvert and a very small stream of water ran through the spillway and over the apron at one place, about as much as would run from a one and one-half to one and three-fourths inch pipe, the remaining surface of the apron being dry most of the time; but during rains the creek carried a large volume of water, depending upon the severity of the rains. It appears that a short time before the boy was drowned, perhaps a day or so, there was a heavy rain so that at the place where the water spilled from the apron there was a hole seven to eight or ten feet in width and six or seven feet deep, at the time the child was drowned. The body of the boy was found in this hole, or pool of water and under the point of the apron, or shelf, which had been created by the water pouring over the apron.

There was testimony that the vicinity is quite thickly populated and that off and on children had played up and down the creek for a period of two or three years; that boys had been seen wading at the point where plaintiffs' son was drowned three or four days prior to the tragedy, though at that time the water was only about knee deep. It appears that at different points along the creek holes are washed our during high water but these are filled again during low water, and then during heavy rains are washed out again by the action of the water.

The testimony shows that decedent lived with his father and mother about two blocks east of the creek and that on the day of the tragedy, in company with a playmate, Woodrow Wilkerson, decedent left the home of a neighbor, Mr. Phillips, for the purpose of going in swimming at the point in the creek where he was subsequently drowned. The testimony of the Wilkerson boy is all the record affords as to how the boys reached the creek, and he stated they crossed Mr. Phillips' pasture and climbed through two right of way fences; that there was nothing to prevent them from going through the fences; that they were built "just so you could get through it." The evidence shows that defendant's right of way was enclosed by a fence on each side thereof, but fails to show the kind of fences they were or of what material they were constructed. However, there was evidence to the effect that the west fence was sufficient in construction to prevent the cattle and hogs of Mr. Turley who farmed the land west of the right of way, from going through on to the right of way. As regards the condition of the fence on the east side, the only testimony of importance relative to it was that of Mr. Phillips, living near and on east of the right of way. His testimony was that on being notified by the Wilkerson boy he went immediately to the scene of the drowning and that he went through the fence "pretty easily" but he never noticed its condition. Mr. Turley who farmed land on both sides of the culvert testified he was there on the day the boy was drowned, but that he did not notice the east fence as to its condition.

Plaintiff Morris A. Williams testified the fence on the west side was low, about two and one-half feet high, and ran up to the abutment of the culvert; and that it had been repaired within the year immediately preceding the trial of the cause. This witness also testified that between the northern end of the abutment and the first post of the west fence, there was no fence but a hole existed where one could pass through. As to this, Mr. Turley testified there was room enough for a man to walk between the fence post and the abutment; but that his hogs had never gotten through this

space because the creek ran into the fence before it got down that far. There is no evidence that the boys passed through this opening. Witness Phillips testified that part of the west fence was down. There is testimony tending to show that the place where the boy was drowned was east of defendant's west fence as then constructed.

There are but two assignments of error, to-wit, (2) that the court erred in directing the jury to find for defendant in instruction "A;" and (b) in holding that section 9948, Revised Statutes, 1919, which requires railroad companies to fence their rights of way, was intended only for the protection of animals. The petition shows plaintiffs largely base their right of recovery upon the "attractive nuisance" or what is commonly called the "turntable" doctrine. It is charged "a dangerous and attractive nuisance, attractive and dangerous to children" was created and maintained by defendant.

One of the leading cases in which the attractive nuisance rule is discussed is that of Peters v. Bowman, 47 Pac. (Calif.) 598. a case arising out of the drowning of a boy in an unguarded pond on private property, wherein the owner was held not liable. The court said:

"A turntable is not only a danger specially created by the act of the owner but it is a danger of a different kind to those which exist in the order of nature. A pond, although artificially created, is in no wise different from those natural ponds and streams which exist everywhere, and which involve the same dangers and present the same appearance and the same attractions to children. A turntable can be rendered absolutely safe, without destroying or materially impairing its usefulness, by simply locking it. A pond cannot be rendered inaccessible to boys by any ordinary means. Certainly no ordinary fence around the lot upon which a pond is situated would answer the purpose; and therefore, to make it safe, it must either be filled or drained, or, in other words, destroyed. But ponds are always useful and often necessary, and where they do not exist naturally must be created in order to store water for stock and domestic purposes, irrigation, etc. Are we to hold that every owner of a pond or reservoir is liable in damages for any child that comes uninvited upon his premises and happens to fall in the water and drown? If so, then upon the same principle must the owner of a fruit tree be held liable for the death or injury of a child who, attracted by the fruit, climbs into the branches and falls out. But this, we imagine, is an absurdity, for which no one would contend, and it proves that the rule of the turntable cases does not rest upon a principle so broad. . . ."

The same rule was applied in this State in the early case of Overholt v. Vieths, 93 Mo. 422, wherein a boy was drowned in an unguarded pond which had formed in a rock quarry on a lot owned by the city of St. Louis. It was there held the facts would have justified a directed verdict for the defendant. In that case the banks of the creek were precipitous and not guarded by a fence. Judge NORTON who wrote the opinion disapproved the reasoning in the case of Klix v. Nieman, 68 Wis. 271, 32 N. W. 223, saying, in part:

"It surely is not the duty of an owner to guard or fence every dangerous hole or pond or stream of water on his premises, for the protection of persons going upon his land who had no right to go there. No such rule of law is laid down in the books, and it would be most unreasonable to so hold."

To the same effect are Gillespie v. McGowan, 100 Pa. St. 144; Moran v. Car Co., 134 Mo. 641, 36 S. W. 659; Arnold v. City, 152 Mo. 173, 53 S. W. 900; Carey v. City, 187 Mo. 715, 86 S. W. 438; Rallo v. Const. Co., 291 Mo. 221, 236 S. W. 632.

It may not be denied that a pond of water is attractive to boys for play, swimming and fishing; but the mere fact that it is an attractive agency is not, within itself, sufficient to subject the owner to liability for accidents. That many boys, every year, lose their lives by drowning is a matter of common knowledge. It is also of common knowledge that the number of such deaths in comparison to the total number of boys who visit such ponds, lakes or streams for the purpose of swimming, playing or fishing, is comparatively small. In our opinion it would be extending the doctrine too far to hold that a pond of water is an attractive nuisance and therefore that such a case as the one before us should come under the class of turntable cases. A turntable can be rendered safe without impairing its usefulness by simply locking it. Not so with a pond which cannot be rendered inaccessible to boys by any ordinary means. Beyond question no ordinary fence would answer the purpose. The pond would need to be either filled or drained and its usefulness destroyed. We hold the facts of the present case do not bring it within the attractive nuisance doctrine. Moreover, without attempting to pass upon the weight of the evidence, we may observe there is found in the record no positive proof that the pool wherein the boy was drowned was on defendant's right of way. Plaintiff Morris A. Williams testified that the pool in which his boy was drowned was about on the west line of defendant's right of way, but that he had no exact way of determining where the west line of the right of way was. He also testified that the pool was east of a fence which formerly ran straight across the creek some years ago; but the record is

barren of evidence to the effect that defendant constructed or maintained said fence, or that it was on defendant's right of way. We hold this evidence not of sufficient substantiality to carry the case to the jury. [Arnold v. City, supra.]

Plaintiffs strongly urge that section 9948, Revised Statutes 1919, imposes a duty upon defendant to fence its right of way, and that the fences maintained by defendant were not lawful fences. The section provides:

"Every railroad corporation formed or to be formed in this State, and every corporation to be formed under this article, or any railroad corporation running or operating any railroad in this State, shall erect and maintain lawful fences on the side of the road where the same passes through, along or adjoining enclosed or cultivated fields or unenclosed lands, with openings and gates therein, to be hung and have latches or hooks, so that they may be easily opened and shut, at all necessary farm crossings of the road, for the use of the proprietors or owners of the land adjoining such railroad, and also to construct and maintain cattle guards where fences are required, sufficient to prevent horses, cattle, mules and all other animals from getting on the railroad; and until fences, openings, gates and farm crossings and cattle guards, as aforesaid, shall be made and maintained, such corporation shall be liable in double the amount of all damages which shall be done by its agents, engines or cars to horses, cattle, mules or other animals on said road, or by reason of any horses, cattle, mules or other animals escaping from or coming upon said lands, fields, or enclosures, occasioned in either case by the failure to construct or maintain such fences or cattle guards." (Etc.)

In this connection it is urged by plaintiff that the statutory fence must be such as to form an effective barrier against persons as well as cattle, mules, horses or other animals. But the reported cases in this State hold to the contrary. The purpose of the statute is clearly defined in Rhinehart v. Railroad, 204 Mo. 269, 277, 102 S. W. 958, wherein it is said:

"The statute requiring railroads to be fenced had a threefold purpose, namely: For the security of live stock; for the benefit and protection of the owners of enclosures through which the road passes; and chiefly the preservation of the persons and lives of passengers—which would be greatly endangered if cattle and other live stock were not restrained from going upon the tracks." [See, also, Shaw v. Railroad, 184 S. W. (Mo.), 1151; McCarthy v. Railroad, 240 Fed. 602.]

It is difficult to conceive what manner of fence a Legislature could describe which would prevent children from going on the right of way of a railroad company. Certainly no fence which,

as a western judge expressed it, was "pig-tight, horse-high and bull-strong" would accomplish the purpose and be an effective obstacle to an ordinary boy of six years and upwards who, in the absence of parental care, might conclude to get on the other side of it. [Railroad Co. v. Bradford, 49 N. E. (Ind.) 388.] Those of us who in the years agone were boys know that it is quite impossible to fence successfully against boys who desire to "see the other side" whether the purpose be to swim, play, fish or explore a neighboring watermelon patch. This observation is possibly *obiter* but it is pertinent. Judge LAMM, in logical drollery, admirably expressed the thought in Kelly v. Benas, 217 Mo. 1, 13, 116 S. W. 557, saying:

"Shall he fence against adventurous, trespassing boys? Almost as well suggest that he built a wall against birds. . . We cannot well write the law that way."

And so we cannot accept plaintiffs' suggestion that it was the intent of the Legislature in the section under consideration to require the railroad companies to fence against persons. [Carey v. City, supra; Overholt v. Vieths, supra; Barney v. Railroad, 126 Mo. 372.]

The cases chiefly relied upon by plaintiffs in this connection are Isabel v. Railroad, 60 Mo. 475, 484, and Dickson v. Railroad, 124 Mo. 140, 148. In the Isabel case the road bed was laid near a dwelling house and the child of the owner wandered upon the track and was killed by a train. The court held that plaintiff might show, as an element of negligence on the part of the company, a failure to fence its tracks as required by statute, even though the primary object of the requirement was merely the protection of cattle and hogs. Recovery was allowed under the humanitarian rule. The child was only twenty-one months old and was living with it grandparents, its mother being dead. The house in which the grandparents lived had been built prior to the construction of the railroad. The situation in that case is similar to the Rinehart case, supra, wherein Judge WOODSON analyzed the situation as above stated. In the Dickson case the facts are that by reason of a defective fence a bull wandered upon the track and was struck by an engine, with the result that the engine was thrown from the track and the engineer killed. The widow was allowed to recover because of the negligence of defendant in failing to maintain a statutory fence. The declaration in that case cannot aid plaintiffs herein.

While section 9948, Revised Statutes 1919, requires railroad companies to erect and maintain fences, section 5512, Revised Statutes 1919, defines what shall be deemed a sufficient enclosure. The latter section describes what materials shall be used, at what dis-

tances from each other the posts shall be set and how many wires, slats, nails, etc., are to be fastened to the posts. In Russell v. Railroad, 83 Mo. 507, 511, the Supreme Court declared the word "lawful" as used in the statute applies merely to the quality of the fence, its height, materials used, etc. [See, also, Shaw v. Railroad, 184 S. W. 1151.] Under the law and the record here presented we hold there was no error in the action of the court in directing a verdict for defendant. The judgment is accordingly affirmed. *Bland, J.*, concurs; *Trimble, P. J.*, absent.