**Franklin J. BAKER and Maysel Baker, Appellants,**

v.

**PRAVER AND SONS, INC., a Corporation, Respondent.**

No. 49341.

Supreme Court of Missouri,

Division No. 2.

Nov. 14, 1962.

William W. Cochrane, Perry M. Cortner, Kansas City, for appellants, Raymond, West & Cochrane, Kansas City, of counsel.

Thomas J. Wheatley, J. R. Clagett, Kansas City, for respondent, Kemp, Koontz, Clagett & Norquist, Kansas City, of counsel.

BARRETT, Commissioner.

Franklin and Maysel Baker instituted this action to recover $25,000 damages for the wrongful death of their son William on March 17, 1959. William was four and one-half years old when he was drowned in a pool of water on land being developed by the defendant, Praver and Sons, Incorporated. The trial court sustained the defendant's motion for a directed verdict at the close of the plaintiffs' evidence and the plaintiffs have appealed.

The defendant corporation or its predecessor family-owned partnership developed the subdivision in Jackson County known as Ruskin Heights and in March 1959 was in the process of developing an adjoining tract of land to be known as Ruskin Hills. The tract had been engineered and John West Construction Company was bulldozing and grading the "raw farm land" for Praver and Sons. The plaintiffs, Franklin and Maysel Baker, lived at 11101 Sycamore Street in Ruskin Heights. In general, Sycamore faces west and is a crescent-shaped street and in this particular area consists of 14 or 15 lots, most of them not built upon. The Bakers' home faced west on lot 157, almost in the center of a rather long block. To the southeast and back of the homes on Sycamore, particularly to the rear of the Bakers' home, there were no streets or houses and to the dividing line between Ruskin Heights and Ruskin Hills and beyond the area had grown up in grass and weeds. Just to the rear of lot 160 there was a sewage disposal plant with a "chain link fence" around it.

The "raw land" in Ruskin Hills, later developed into Herrick Avenue and 111th Street, was north and east of 11101 Sycamore Street. And prior to March 1959 a small creek or branch intersected this tract of land in an east-west direction, and southeast off of the "main creek" there was a smaller tributary, probably fed in part by a storm sewer or perhaps by natural seepage from a small spring. On the tributary, at least since 1957, there had been a small pool of water, 6 inches to 2 feet deep, sometimes called a pond. Also after 1957 a rather large dump consisting of the debris from the Ruskin Heights tornado was formed along the tributary stream and at least one side of the pool of water. A dirt roadway to the pile of debris was formed by trucks and intersecting the roadway and the neighborhood there were paths. The plaintiffs' evidence tended to show that in those days and in those circumstances neighborhood children used the dirt road, sometimes as a short cut to and from school, and the paths for the purpose of playing cops and robbers and cowboys and Indians, and that they played on the dumped debris and a pile of lumber nearby.

In March 1959 it was a part of the work of the grading company to move the channel of the creek and its tributaries and in performing this task the small pool of water was pushed uphill and to the west approximately 25 feet. And temporarily there was an additional damming of the tributary and the pool of water to prevent seepage. The oval-shaped pool of muddy water thus formed was 5 feet wide, 12 feet long and

5 feet deep and the adjacent bank was 5 to 6 feet high. There were no fences or barricades around the pool, and floating in it were sticks and debris from the dump. It was 225 feet from the northeast corner of the plaintiffs' lot to the pool. There was a "rise" in the ground and the pool of water could not be seen from the plaintiffs' home. Mr. Baker had not seen it and Mrs. Baker did not know it was there. These changes in the creek bed and the moving of the pond were brought about within a five-day period prior to March 17. But some of the plaintiffs' witnesses testfied that even in that period of time neighborhood children used the dirt roadway, the paths, and the vacant area to the rear of the Bakers as a "playground"—that is the way a 15-year-old boy described it. The day before Billy drowned this boy followed the road and paths to the pool of water and threw rocks in it and he had seen other children playing on the dump. It was forbidden to Billy however to play in this area, he was "supposed to remain in his own back yard" and on one occasion had been punished for "wandering."

On March 17 two "heavy equipment" operators were continuing to work at grading and earth moving and about 11:30 o'clock "three little boys came up there * * * and they were standing there watching us work, and then they got their idea to follow me * * *." At that point the operator "got off the cat and told the boys to go home." It was then lunch time and sometime after lunch the men crossed over a ditch to move a brush pile, they stopped for fuel and "here these three little boys was. So this boy, the smallest one was right with me and I was talking to him, and so we got the fire burning and * * * Herb said, 'you boys had better get for home.' And we stood there a few minutes and I said, 'Now, sonny,' I said, 'you had better go home, because your mother will be looking for you.' And I said, 'You go right down there and you can cross the ditch right there.' So he started paddling

off and I went on to work and Herb did too * * *."

Billy was in the house when his father called home, as he usually did, during the lunch hour, and shortly after lunch his mother saw Billy and the Keith boys, ages 5 and 7, "directly behind our lot" watching the bulldozers. Later, while another neighbor was there for coffee, she saw Billy on the pile of debris. By the time the neighbor left Billy was out of sight and Mrs. Baker began looking for him but could not find him. Shortly the bulldozer operators found him drowned, floating face down in the pool. The next day the bulldozers obliterated the pool of water.

In these detailed circumstances the appellants contend that the defendant's negligence and consequent liability was a question for the jury to resolve and that the court erred in directing a verdict at the close of their evidence. In general the summarized version of their argument is that Billy was a licensee rather than a trespasser and that "The evidence shows that defendant knew, or should have known, that many children of tender years habitually and continually used its land as a playground, and therefore defendant gave tacit consent to such use. Under these circumstances, defendant owed these young children the duty of exercising ordinary care to see that the premises were reasonably safe for said children, and the question of whether or not the pond was a dangerous condition and whether or not defendant exercised proper care are jury questions." With this broad general statement as a starting point, and since the court directed a verdict at the close of the plaintiffs' evidence, the plaintiffs are in the favorable position of being able to urge upon the court any and all possible theories of liability in this type case. It is not necessary, however, to consider in detail cases from other jurisdictions, neither is it necessary to consider any condition other than pools, ponds or other collections of water, the subject has become that specialized. In 8 A.L.R.2d 1254 there is an exhaustive

annotation entitled "Liability of landowner for drowning of child." In that very complete annotation all of the various theories of liability and of nonliability for children drowning in pools, ponds and other collections of water are set forth. The Missouri cases up to 1948 are there collected and other than for illustrative purposes it is not necessary to list those cases in this opinion. Furthermore, the subject of the duties of owners and occupiers of land to trespassers, licensees and invitees, and particularly to children, has been thoughtfully and critically examined by Harper, James, Prosser and others. 2 Harper & James, Torts, Ch. 27; Prosser, Torts, Sec. 76, p. 440. In the circumstances of this record some authorities and some jurisdictions, as in the annotated case, Banker v. McLaughlin, 146 Tex. 434, 208 S.W.2d 843, 8 A.L.R.2d 1231, would say that Praver's negligence was a jury question. The quotation from the appellants' brief is a general summary of their theories and it is sufficient here to say that up to now this court has been unwilling to adopt their suggestions as to liability.

Most recently in Cox v. Gros, Mo., 360 S.W.2d 691, this division of the court has had occasion to consider the applicability of some of these theories to a child, age 5, and an injury on a piece of "cut, sharp, pointed and jagged marble, created and maintained by defendant." In that opinion several annotations with respect to injuries to children from sharp glass, inherently dangerous substances, ashes, cinders and many other objects and conditions are collected and it is not necessary to duplicate and distinguish them here. It was pointed out in Cox v. Gros, however, that on at least two occasions, this court has construed section 339, Restatement, Torts, as an expansion of the attractive nuisance doctrine and said that "this court has been unwilling to extend the doctrine as far as the rules adopted by the Restatement would extend it." Patterson v. Gibson, Mo., 287 S.W.2d 853, 854–856; Hull v. Gillioz, 344 Mo. 1227, 1234–1235, 130 S.W.

2d 623, 627. While there may be some inconsistency in the Missouri cases (compare in its basic theory Davoren v. Kansas City (banc 1925), 308 Mo. 513, 273 S.W. 401, 40 A.L.R. 473, and all other Missouri cases), this jurisdiction is committed to the view that the attractive nuisance doctrine is not applicable to "ordinary water hazards" including ponds, water-filled quarries and pools of water in creeks and natural water courses. 8 A.L.R.2d, 1. c. 1259, 1267; Holifield v. Wigdor, 361 Mo. 636, 235 S.W.2d 564; Rallo v. Heman Construction Co., 291 Mo. 221, 236 S.W. 632; Kemp v. Doe Run Lead Co., Mo.App., 34 S.W.2d 1002; Williams v. Kansas City, Clay County & St. Jos. Ry. Co., 222 Mo.App. 865, 6 S.W. 2d 48. It should be noted in passing that there is at least one possible distinction in some of the Missouri cases, visitors, including children, to public parks are invitees and there has always been liability on the part of municipalities with respect to certain activities and conditions connected with their streets. See for example: Capp v. St. Louis, 251 Mo. 345, 158 S.W. 616, 46 L.R.A.,N.S., 731; Jensen v. Kansas City, 181 Mo.App. 359, 168 S.W. 827; Dutton v. City of Independence, 227 Mo.App. 275, 50 S.W.2d 161.

The so-called "playground rule" (8 A.L.R. 2d, 1. c. 1285), whatever its merits, has had very limited acceptance (65 C.J.S. Negligence § 40, p. 505), and as far as appears has not been previously advocated as a basis of liability in this jurisdiction. The "hard-by rule" has been recognized (Wells v. Henry W. Kuhs Realty Co., Mo., 269 S.W. 2d 761), but has been strictly limited to a dangerous artificial condition "abutting upon or close to" a public highway. It was recently held that the doctrine was inapplicable to a deep pool of water in an abandoned quarry when, as in this case, the pool was not in fact "hard-by" a public street or highway and it was necessary for a boy sixteen to travel over beaten paths from a road to reach an old swimming hole. Winegardner v. City of St. Louis, Mo., 346 S.W.2d 219.

It is not necessary to further illustrate and it is not necessary to again set forth the reasons advanced against liability in this and similar cases, it is sufficient to say as indicated, in short, that the proved and admitted circumstances do not hypothesize or permit the inference of negligence and liability upon any theory now recognized in this jurisdiction and, therefore, the judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All of the Judges concur.