Chester D. CRAWFORD, Jr., and Betty M. Crawford, husband and wife, Appellants,

v.

PACIFIC WESTERN MOBILE ESTATES, INC., and Wilma Gilbert, Respondents.

No. KCD 27991.

Missouri Court of Appeals, Kansas City District.

Feb. 28, 1977.

Ralph O. Wright, Gary W. Collins, Kansas City, for appellants.

Paul H. Niewald, Kansas City, for respondents.

Before WASSERSTROM, P. J., and SOMERVILLE and TURNAGE, JJ.

WASSERSTROM, Presiding Judge.

Plaintiffs seek damages for wrongful death of their six year old son, Mark, who drowned in a settlement tank maintained by defendant Pacific Western Mobile Estates, Inc., as part of its sewage treatment plant at Liberty Village Trailer Park in Clay County, Missouri. The jury returned a verdict of $30,000 against both Pacific Western and its resident manager Wilma Gilbert. However, the trial court, pursuant to after trial motions, set aside the verdict and entered judgment for defendants. Plaintiffs appeal. Reversed.

■ The sole issue presented is whether the evidence established a submissible case of negligence. In making this determination the evidence must be viewed in the light most favorable to the plaintiffs, drawing all favorable inferences on their behalf. *Wehrkamp v. Watkins Motor Lines, Inc.,* 436 S.W.2d 698, 700 (Mo.1969); *Boyle v. Colonial Life Ins. Co. of America,* 525 S.W.2d 811, 814–15 (Mo.App.1975); *Michaud v. Burlingame,* 490 S.W.2d 680, 682 (Mo.App.1973); *Rawson v. Ellerbrake,* 423 S.W.2d 14 (Mo.App.1967).

The tragic accident in question occurred on November 22, 1973. Plaintiffs, together with their son Mark, were residents of Pacific Western's trailer park which accommodated 143 residential trailers. The southwest part of the park was reserved for non-family residents, while the southeast part was reserved for families with children. At the extreme northern part of the trailer park, and closer to the family portion than to the non-family section, Pacific Western maintained a sewage treatment plant of which the settlement tank was a part. The nearest trailer was approximately 200 yards from this sewage treatment facility.

The settlement tank itself resembled a swimming pool; it was approximately 25 feet long and 11 feet wide, with vertical concrete reinforced walls 7½ feet deep. The water level was maintained at a depth of 6 feet, which means that the surface of the effluent was 1½ feet below the top ledge of the tank (which is at ground level). There was no ladder or other device which would aid anyone who fell into the tank to climb out. The architect designed the tank with a cypress deck to completely cover the top of the tank. The deck was to rest upon a lip or indentation at either end of the tank and fit flush with the top. Although the tank does have the described lip or indentation, the tank has never been cover-

ed since the trailer park was acquired by Pacific Western in August, 1973, and manager Gilbert had never observed nor was she ever told about any covering of any kind.

The architect also designed a fence to be built around the tank, and a six foot tall solid wooden flat fence had been erected and was in place. Adjacent to this wooden fence and borrowing one side thereof, a rectangular area was fenced off with a chain link fence for use as a storage area. The chain link fence had a gate and there was also a gate between the storage area and the tank area. Gilbert testified that these gates were kept locked at all times.

After Pacific Western acquired the trailer park, the previous owner removed approximately 60 trailers from the trailer park, leaving behind on the ground concrete blocks which had been used to support those trailers. Pacific Western's maintenance employees gathered up these blocks and piled them against the wooden fence which enclosed the sewage settlement tank. These blocks were stacked in such a way so that "they were sort of like stairs going up" and reached to within 6 inches of the top of the fence. Although a child could not have gotten over the 6 foot wooden fence otherwise, the "stairway" of concrete blocks could be easily ascended by a child and there remained only a short jump to the ground inside of the sewage tank area.

A number of children lived in the trailer park with their parents, and they customarily played throughout the trailer park. There were no warning signs posted anywhere on the grounds to alert parents of any dangerous condition inside the wooden fence, nor were the tenants notified of the existence of the treatment facility. Mark's father testified that he did not know what was inside the fence until after the fatal accident. A neighbor who had lived in the court testified that she also was unaware of the sewage facility inside the fence until after the accident.

On the afternoon of the accident a number of children, aged six to ten, among whom Mark was one, were playing in the trailer park in the vicinity of the wooden fence described and they were seen playing on the concrete blocks piled next to the wooden fence. At about 3:30 an older boy walking by was hailed by the children and was told that someone was in the sewage tank. He climbed the blocks, but could see nothing but a ball floating on the surface of the murky effluent. Other children went to notify Mark's father, who was working beside his trailer, that someone was in the sewer. Mr. Crawford, unaware of the existence of a sewage treatment facility on the grounds, headed toward a storm sewer next to the street, but was corrected by the children. Mr. Crawford and a neighbor who had been summoned probed the pool with a rake and a two by twelve board and succeeded in locating and removing Mark's submerged body. Attempts at resuscitation were unsuccessful. In the course of these rescue attempts, Mr. Crawford saw a wooden ladder-like contraption lying across the width of the tank and which served as a bridge. Also lying across the width of the tank was a metal latticework which Mr. Crawford testified would probably not have borne the weight of a grown man but which might have borne the weight of a small child. Mr. Crawford also noticed small hand prints on one side of the concrete tank on the 1½ foot vertical concrete wall above the surface of the effluent.

Defendants argue vigorously that defendants owed the deceased boy no duty which can be the foundation of recovery, because he was a trespasser when he entered the fenced area. Plaintiffs do not deny the classification of their son as a trespasser,[1] but contend that the landowner nevertheless owed their son a duty of rea-

---

1. Defendants cite cases for the proposition that Mark Crawford was a trespasser or "at best a mere licensee." The question as to the boy's status as a trespasser, licensee or invitee need not be pursued. For reasons which follow in this opinion, we hold that defendants owed a duty to this child under Restatement, § 339. This section which was drafted to cover children who are trespassers, a fortiori covers children who are in the higher classification of licensees or invitees. *Salanski v. Enright*, 452 S.W.2d 143, l. c. 145, (Mo.1970).

sonable care under the standards of Section 339, 2 Restatement of the Law, Torts. Defendants deny that the facts here meet those requirements. The issue in this case accordingly narrows to the question of whether plaintiffs have brought this situation within the scope of the § 339 doctrine.

Section 339 of the Restatement (1965 Revision)[2] provides as follows:

"§ 339. Artificial Conditions Highly Dangerous to Trespassing Children

"A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children."

■ (a) *Reason to anticipate presence of children.* Treating these five requirements

in order, the first question is whether defendants knew or had reason to know that children were likely to enter the fenced area. Defendants lay great stress upon the fact that the record contains no evidence that any children had ever before been in the sewage-treatment facility. That, however, misses the point. Merely because children had not trespassed in the past does not relieve the landowner from liability if there is some reasonable expectation that they might trespass. *Spur Feeding Company v. Fernandez,* 11 Ariz.App. 263, 463 P.2d 847 (1970). Nor must the evidence include proof that children had previously ventured directly into the heart of the hazard itself. As stated in a case decided even before the formulation of § 339, *Starling v. Selma Cotton Mills,* 168 N.C. 229, 84 S.E. 388, 389 (1915): "But in this case these children were not trespassers. They were five or six years old, and were at their usual playground, where they went every day, which fact was necessarily known to the management of the mill. This playground was in the immediate proximity to the reservoir and to the mill, and the officials knew the danger to the children of the children falling in there either in their play or in attempting to get water to drink, as this little boy did." See also Page, The Law of Premises Liability, § 2.12, p. 19.

■ The evidence here shows that many of the families in the trailer court had young children who played all over the trailer court. There was evidence that children played on a retaining wall which, in the words of one resident of the trailer court "is not too awful far" from the stockade picket fence surrounding the sewage plant, and that the fence with vertical

---

**2.** In *Arbogast v. Terminal Railroad Assn. of St. Louis,* 452 S.W.2d 81 (1970), the Missouri Supreme Court adopted § 339 of the Restatement of Torts, in the version originally published in 1934, and plaintiffs in their brief quote and discuss the section in that form. In 1965, the American Law Institute published a revision of § 339 which made certain changes which are discussed in Restatement, Torts 2nd Appendix at page 129. See also for a discussion of these changes, Page, The Law of Premises Liability, § 2.11, p. 17 et seq. *Glastris v. Union Electric*

*Co.,* 542 S.W.2d 65, 1. c. 68 (Mo.App.1976), comments on these changes and treats the portions of the revisions there under consideration as minor corrections which did not change the meaning intended by the original draft. All further discussion in this opinion will be based upon the 1965 revision. This cannot possibly prejudice defendants, inasmuch as the 1965 revision leans in their favor more than does the 1934 original, to the extent that there is any difference at all.

stakes pointed at the top looks like "on old Indian fort." There was evidence that there was a basketball and other toys in the storage area which were open to view through the chain link fence and which could also serve to attract the attention of children. There was further evidence that children played on the concrete blocks which themselves allowed easy access to the sewage tank area itself. Defendant Gilbert, the resident manager of the trailer court admitted that the kids "were like a bunch of damn monkeys and were down there all the time" and there was nothing she could do to keep them out.

Furthermore, the manager Gilbert had full knowledge of the piled up blocks which permitted of such easy access for children to get over the fence. Those blocks had been put against the fence by Pacific Western's own maintenance employees and had been there for a period of months. During that time Mrs. Gilbert went by the area about three times a day. Still further, Mrs. Gilbert took one of the Pacific Western's visiting West Coast officials on an inspection tour of the trailer park in September, 1973, during the course of which they made inspection of this very area, sewage plant and settlement tank, at which time practically all of the blocks piled against the fence at the time of Mark's drowning were already so placed.

The evidence in this case abundantly shows that defendants had good reason to know that children played in the immediate area of the settlement tank and that the conditions were such that the block stairway would provide easy access—if not an open invitation—for children to enter the sewage tank area. Defendants had ample reason to know that sooner or later some child was likely to enter the picket enclosure.

(b) *Reason to realize unreasonable risk.* The second requirement of § 339 is that defendants knew or had reason to know and which they realized or should have realized would involve an unreasonable risk of death. This requirement causes little difficulty under the facts of this case. The prospect of danger was so apparent from the beginning that the architect designed the settlement tank to be protected by both a wooden deck cover and also a six foot high fence. Although the deck cover was apparently never utilized, still the original owner of the trailer park showed a realization of the necessity of some protection by erecting the six foot fence and providing a locked gate to prevent inadvertent entrance into the area. After acquisition of the trailer park by Pacific Western, the necessity of such protection continued to be acknowledged by the defendants as shown by their custom, to which Mrs. Gilbert testified, of keeping the gate carefully locked at all times. Thus the general presence of danger requiring some protection has been established by the actions of defendants themselves. As stated in *Starling v. Selma Cotton Mills, supra*: "The very fact that a fence had been put up, of itself, shows that these authorities were aware of the danger."

Yet, despite this awareness of danger against which the fence constituted the only protection, defendants permitted the piling up of concrete blocks against the fence in such a way as to completely negate the protection which the fence was designed to afford. No question is here presented about whether defendants knew of the location of those blocks—Pacific Western's own employees created that condition. Moreover, the resident manager was reminded by her own eyesight of the dangerous condition daily. The evidence amply shows that defendants had reason to know and to realize the unreasonable risk of death or injury.

(c) *Lack of realization of risk by trespassing child.* The third requirement for inquiry is whether Mark Crawford, because of his youth, failed to realize the risk involved. This element of plaintiffs' case represents by far the most difficult point of decision and it is the one which bears the heavy weight of defendant's attack. Defendants argue the Missouri courts have consistently denied recovery for the death of children who have drowned in ponds,

pools or similar bodies of water and defendants contend that those cases decided under the attractive nuisance doctrine control here.[3] As part of their reliance upon those cases, defendants insist in their brief that Restatement § 339 "is simply a rule setting forth the 'attractive nuisance doctrine'."

Defendants' latter statement errs. The attractive nuisance doctrine originated as an effort by the courts to ameliorate the harsh rules relating to the extremely limited duty of a landowner to trespassers. The courts, however, confined that new doctrine to a very niggardly scope, and legal thought grew in favor of further relief. Out of this current of thought grew § 339 of the Restatement. Although the new § 339 doctrine gradually drew an ever increasing judicial following, the Missouri courts steadfastly resisted this move and time after time expressly rejected § 339. *Baker v. Praver and Sons, Inc.*, 361 S.W.2d 667 (Mo. 1962); *Thieret v. Hoel*, 412 S.W.2d 127 (Mo. 1967). In the *Baker* case, the Supreme Court spelled out its refusal to expand the landowner's liability as would be required under § 339, holding: "It was pointed out in *Cox v. Gros*, Mo., 360 S.W.2d 691, however, that on at least two occasions, this court has construed section 339, Restatement, Torts, as an expansion of the attractive nuisance doctrine and said that 'this court has been unwilling to extend the doctrine as far as the rules adopted by the Restatement would extend it.' *Patterson v. Gibson*, Mo., 287 S.W.2d 853, 854–856; *Hull v. Gillioz*, 344 Mo. 1227, 1234–1235, 130 S.W.2d 623, 627." Not until the decision in *Arbogast v. Terminal Railroad Assn. of St. Louis, supra*, in 1970, more than 35 years after the first publication of § 339, did the Missouri courts yield to the new rules of child trespasser liability. That this

adoption would significantly extend the liability of the landowner was the very reason that the Missouri Supreme Court had for so long resisted the change. Now that the change has been accomplished, the old Missouri decisions applying the former attractive nuisance doctrine must be read with discrimination and applied only with the greatest of caution.

The pond and pool cases decided under the attractive nuisance doctrine, and upon which the defendants so heavily relied, went in part on the ground that these bodies of water constituted open and obvious danger which should be within the comprehension of any child old enough to be permitted to roam at large. To this extent, the pool and pond cases still state the law, and a landowner is not now (just as he was not previously) required to "child-proof" his premises against an obvious danger. The underlying concept mentioned has been expressly stated in Comment j under § 339 as follows:

"There are many dangers, such a [sic] those of fire and water, or of falling from a height, which under ordinary conditions may reasonably be expected to be fully understood and appreciated by any child of an age to be allowed at large. To such conditions the rule stated in this Section ordinarily has no application, in the absence of some other factor creating a special risk that the child will not avoid the danger, such as the fact that the condition is so hidden as not to be readily visible, or a distracting influence which makes it likely that the child will not discover or appreciate it."

The Restatement then goes on in Illustrations No. 6 and 7 to show that the landowner will not be liable for the drowning of a trespassing child in a small artificial pond

---

**3.** The cases cited by defendant are *Winegardner v. City of St. Louis*, 346 S.W.2d 219 (Mo. 1961); *Kowertz v. Dible*, 27 S.W.2d 61 (Mo. App.1930); *Kemp v. Doe Run Lead Co.*, 34 S.W.2d 1002 (Mo.App.1931); *Holifield v. Wigdor*, 235 S.W.2d 564 (Mo.1951); *Thieret v. Hoel*, 412 S.W.2d 127 (Mo.1967); *Baker v. Praver and Sons, Inc.*, 361 S.W.2d 667 (Mo. 1962). Another similar case not cited is *Rallo v. Heman Construction Co.*, 291 Mo. 221, 236

S.W. 632 (1921). Compare, however, the recovery permitted in *Davoren v. Kansas City*, 308 Mo. 513, 273 S.W. 401 (banc 1925) and in *Doran v. Kansas City*, 241 Mo.App. 156, 237 S.W.2d 907 (1951). Note also that recovery was allowed for the death of a child drowned in a cistern in *Leeright v. Ahrens*, 60 Mo.App. 118 (1894) and from death by drowning in a well in *Bichsel v. Blumhost*, 429 S.W.2d 301 (Mo.App. 1968).

on his land, but that he does become liable for the death of a young child from an adjoining nursery if the artificial pond contains gold fish which can attract and distract the child. This distinction, based on whether the dangerous situation is or is not coupled with special distracting factors, has been expressly recognized in *Arbogast v. Terminal Railroad Assn. of St. Louis, supra,* and *Salanski v. Enright, supra. Glastris v. Union Electric Co., supra,* also emphasizes that in evaluating whether or not the distracting factors are sufficient to prevent the trespassing child from realizing the risk, attention must be paid to his lack of judgment due to immaturity.

Analysis of the present situation must therefore take the next step of examining whether the facts here show distracting elements which kept Mark Crawford from realizing the danger inherent in the settlement tank. Such distracting factors did exist. First of all, the effluent in the tank was dark and murky so as to be opaque. No one could tell from looking whether the depth was a few inches or several yards. Next a ball was floating on top of the effluent. Whether Mark Crawford climbed over the wall to recover the ball which he may have been playing with outside the wall or whether he saw the ball floating in the tank only after he got inside the enclosure, in either event the ball represented a plaything which naturally became the focus of distracting attention to this six year old boy.

Added to that situation, there stretched across the tank a wooden bridge and a metal bridge which invited the child out over the pool to bring himself into a position better able to reach toward the ball. The combination of these factors readily support the inference that Mark Crawford was in fact distracted from and did not realize the danger. Under these circumstances, it is easy to understand why this young boy who knew how to swim would not notice that the concrete wall of the tank stood a sheer 1½ feet above the surface of the effluent and that there was no ladder or similar device by which he could get out of the pool in the event he fell in.

The situation in this case is analogous to that in *Cargill, Incorporated v. Zimmer,* 374 F.2d 924 (8th Cir. 1967), an opinion cited and quoted with approval by the Missouri Supreme Court in *Salanski v. Enright, supra.* In *Cargill,* the trespassing boy climbed a ladder on the defendant's silo in order to ascertain whether there was a pigeon roost at the top. The court held that he was entitled to recover under the theory of § 339, despite the fact that danger from height (similar to the danger from bodies of water) is generally considered to be open and obvious. In finding that there was a distracting element preventing the boy's realization of danger, the court said:

" * * * The acknowledged fascination of children to a pigeon retreat at a height of 72 feet off the ground cannot be minimized * * * The steel ladder was an open invitation to a child's aviary. Decedent and other children did not climb the ladder for the thrill and excitement of climbing; the climb was secondary. The jury could find the attraction could focus attention of the child's interest from the true danger involved * * *."

In the case at bar, the wooden and metal bridges across the top of the tank was an "open invitation" equivalent to the steel ladder involved in *Cargill.* The ball floating on the surface of the effluent was at least as attractive a distraction to Mark Crawford as was the pigeon roost involved in *Cargill.* Just as the *Cargill* situation met the requirement of § 339, so also does the situation in the case at bar.

(d) *Comparison of the burden of eliminating the danger with the character of the risk.* The fourth element to be proved under § 339 requires that the burden to the landowner of eliminating the danger be slight as compared to the risk to the trespassing children. Satisfaction of this requirement presents no problem here. All that was necessary to protect against the danger created by the open tank was to eliminate the stacked pile of concrete blocks immediately alongside the wooden fence enclosing the sewage treatment area. Noth-

ing at all appears which would require those blocks to be stored in this particular location. They could have been piled up anywhere else, thereby eliminating the danger which led to Mark Crawford's death. Even pulling down the height of the stack of blocks would probably have been enough. The cost of so doing would have been negligible.

(e) The final requirement of § 339 is a showing that the landowner failed to exercise reasonable care to protect the children. Comment *o* under this section says that the purpose of this requirement is to create liability "only if the possessor fails to take the steps which a reasonable man would take under such circumstances. If the possessor has exercised all reasonable care to make the condition safe, or otherwise to protect the children, and has still not succeeded, there is no liability." The Comment goes on to say that in some circumstances a warning would be all that could be expected of a reasonable man, and if so the giving of a warning may satisfy the landowner's duty.

No such problem complicates the instant case. Defendants had a safe condition if they themselves had not eliminated the safety feature of the fence by piling the concrete blocks against it. That danger was created by the affirmative acts of their own workmen, and defendants did nothing at all to offset the consequent danger. Even if a warning would have been sufficient, no warning, either written or oral, was ever given by defendants to anyone. No question can exist but what plaintiffs made a submissible case as to defendants' negligence.

Defendants make an additional argument that "the evidence failed to prove any causal relationship between the conduct of defendants and the death of the decedent." A very similar argument was rejected in *Leeright v. Ahrens, supra,* in which a child fell unseen into a cistern which was protected by a dilapidated fence and drowned:

"The record shows that the happening of the accident was not witnessed by anyone; hence there could be no direct or positive testimony as to the actual manner of its occurrence. It does not follow, however, that there is no rational basis for an inference as to the manner in which the child got into the cistern. There is positive evidence that the box around the cistern was of a character that a child like the deceased, by leaning against it or sitting on it, would fall into the cistern and that the child was playing near it at a late hour of the night. There is also evidence that the body of this child was taken from the cistern on the following morning, at which time the top plank of the box was found leaning into the cistern, as if it might have been detached or dragged by one falling. From this testimony and these physical facts the jury might have legitimately inferred that the accident happened as described in plaintiff's petition. That they might also have drawn other and different inferences from the same testimony is immaterial. The rule is that an objection that there is no evidence to support a finding is not well taken, if it appears there is evidence from which the facts necessary to be shown might have been inferred by the jury, even though such facts would afford the basis of other diverse inferences. In such cases it is conclusively presumed that the jury drew *that inference* which would support their finding." (Emphasis in the original).

Defendants' present argument is also answered by the following quotation from *Anderson v. Cahill,* 485 S.W.2d 76, 80 (Mo. 1972):

"Respondent further contends that no evidence was produced to show how plaintiff entered the premises and that he cannot, therefore, he [sic] held to have been negligent in failing to properly fence or barricade the area causing plaintiff's injury. The question, however, is not how plaintiff entered the premises, but whether reasonable precautions had been taken to prevent entry by trespassing children. A jury could find that such precautions were not taken and that the cost to defendant of providing fencing to

prevent entry would have been slight compared to the risk to young children who might trespass therein."

It follows from the foregoing that the trial court erred in setting aside the jury verdict. The judgment is therefore reversed with instructions to the trial court to reinstate the jury verdict.

All concur.